# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **NO. 18-CR-10064-LTS** |
| | ) | |
| **RYAN HOLLERAN** | ) | |
| | ) | |

## MOTION TO SUPPRESS FRUITS OF UNLAWFUL SEARCHES OF BASEMENT AND SMART PHONE AND SUPPORTING MEMORANDUM

Defendant, Ryan Holleran, respectfully moves, pursuant to the Fourth Amendment and Rule 12 of the Federal Rules of Criminal Procedure, to suppress evidence unlawfully seized by law enforcement agents from the basement of his apartment building on November 9, 2017, and from his smart phone on November 14 and 16, 2017.

Two warrants are at issue. The first authorized a search only of Holleran's second-floor apartment and did not extend its authorization to his area of the basement. Further, the affidavit in support of the application for the warrant contained no information on the reliability of the confidential informant who supplied information to the affiant detective. Much of the allegations about criminal activity are in the form of hearsay statements from an "unwitting party" known only to the confidential informant. Therefore, the warrant was not properly issued; and even if it was, officers exceeded its scope.

The second warrant authorized a search of Holleran's iPhone. The affidavit in support of the application for that warrant did not establish a nexus between the smart phone and Holleran's alleged criminal activity. The second warrant therefore also was not properly issued.

The fruits of both searches – contraband seized from Holleran's basement and data extracted from his iPhone – should be suppressed.

1

I.      **FACTS**

A.      **Search of Basement**

On November 9, 2017, Detective Kevin Barbosa of the New Bedford Police Department submitted an application for a search warrant to the New Bedford District Court. *See* Application for Search Warrant, Det. Kevin Barbosa, Nov. 9, 2017, attached as Exhibit A. The detective sought authorization to search 116 North Street, Apartment 2,[1] in New Bedford for cocaine and related paraphernalia.

The detective explained in his affidavit in support of the application that he was investigating illicit drug activity from the specified apartment. Detective Barbosa stated that he had been working with a confidential informant ("CI-1") who told him that the resident of the apartment, Ryan Holleran, was selling cocaine from his home. CI-1 did not claim to have purchased cocaine directly from Holleran but rather from an "unwitting party" who in turn obtained it from Holleran:

> CI-1 knows "Ryan Holleran" sells cocaine because CI-1 has personally purchased cocaine and continues to do so from an unwitting party in the past that has purchased cocaine from "Ryan Holleran" at 116 North Street Apartment 2. During this investigation CI-1 informed this affiant that CI-1 will contact an[] unwitting party to purchase Cocaine from "Ryan Holleran". [CI-1] contacts the unwitting party who in turn contacts "Ryan Holleran". [CI-1] stated it has been present when phone contact is made between the unwitting party and "Ryan Holleran". [CI-1] also stated it has been present when the unwitting party is directed to 116 North Street Apartment 2 where it has observed the unwitting party meet with "Ryan Holleran". [CI-1] stated that the narcotic transaction is completed. The unwitting party then returns with the Cocaine.

*See id.* at 3.

The detective stated that during the week of October 8, 2017, he met with CI-1 to observe

---

[1]      Apartment 2 is mentioned throughout the application; no reference is made to a basement.

a controlled buy conducted by the unwitting party:

> CI-1 was then presented with an amount of monies to purchase Cocaine from Ryan Holleran out of 116 North Street Apartment 2. . . . This affiant maintained surveillance of the unwitting party and CI-1 as CI-1 met with the unwitting party. This affiant then observed CI-1 hand the unwitting party money. . . . The unwitting party was then observed walking into the driveway of 116 North Street and going to the back of the residence. After a short amount of time the unwitting party exited the rear of 116 North Street and travelled to a predetermined location where it was observed meeting with CI-1. . . . This affiant then met with CI-1 at a prearranged location following the meeting. CI-1 presented this affiant with Cocaine it stated [] was purchased by the unwitting party.

*Id.* at 6.

The detective used nearly identical language to describe another controlled buy conducted by the unwitting party between November 6 and 9, 2017. *See id.* at 6-7.

The affidavit did not contain any information on the reliability of CI-1 or the unwitting party. It was silent as to the length of time CI-1 had been providing information and whether CI-1 had provided reliable information in the past. It contained no information whatsoever about the unwitting party's identity, background, or the nature of the unwitting party's relationship with CI-1.

Detective Barbosa also described three instances[2] of activity he cited as being consistent with drug sales from Holleran's home:

1.  As he conducted surveillance of the apartment, he observed Holleran exit the home and enter his car. The detective said he saw him pull up in front of another house and pull up behind a vehicle. He said a woman exited the other vehicle and reach into Holleran's driver's side window. Holleran then returned home.

2.  The detective stated he observed a vehicle pull up close to Holleran's home. The driver

---

[2]   It is unclear from the affidavit whether all three instances occurred on the same day or on separate days.

went into the home and exited within three minutes. Detective Barbosa does not state

which apartment the driver entered.

3. He also stated that he saw an individual pull up in front of the residence and exit the

vehicle. After an unknown amount of time, he "exited from the driveway" and reentered

his vehicle.

*See id.* at 5-6. The detective did not identify any of the parties except for Holleran.

On the same day that the application was made, the court issued the search warrant as

requested. The areas to be searched were described as follows:

1. "116 North Street Apartment 2 in New Bedford, Massachusetts. 116 North Street

Apartment 2 is a multi family dwelling with green wood shingles with a white trim

around the windows. The numbers 116 are affixed to the left of the front door. The front

door faces north. which is occupied by and/or in the possession of: Ryan Holleran"

2. "[O]n the person or in the possession of: [Ryan Holleran]"

3. "[A]ny person present who may be found to have such property in his or her possession

or under his or her control or to whom such property may have been delivered."

Search Warrant, Nov. 9, 2017, attached as Exhibit B.

An Assistant Clerk of the New Bedford District Court authorized the search warrant on

November 9, 2017. Later that day, police officers executed the warrant at Holleran's second

floor apartment. *See* Police Report, Det. Kevin Barbosa, Nov. 11, 2017, attached as Exhibit C.

Officers breached Holleran's door and arrested him in his kitchen. An iPhone was seized from

his left pant pocket. Police Report, Det. Sasha Vicente, Nov. 11, 2017, attached as Exhibit D, at

1. Upon searching through the apartment, police seized other items, most notably Oxycodone

pills, Codeine syrup, THC, and $452 in cash. *Id.*

4

In Holleran's dining room, officers found three keys, one of which fit into a padlock on the basement door. According to the police report, the padlock was unlocked. The officers searched the basement and seized several items, including:

1. From a large grey cylinder: LSD, Buprenorphine, a digital scale, and $1,425 in cash

2. From a large grey tote bag labeled "X-MAS": a paper bag containing cocaine, crack cocaine, and Oxycodone; 2 boxes of ammunition; a plastic bag containing a prescription bottle for Codeine syrup "matching the bottles in the 2nd floor search"; 3 digital scales; and 2 flip phones

3. From a large grey tote bag labeled "X-MAS STUFF": a blue duffle bag containing a rifle lower receiver and a loaded sawed off shot gun; a plastic bag containing THC oils; a black suitcase containing ammunition, a loaded .45 cal revolver, a rifle upper receiver, a .9 mm gun, and ammunition

*See id.* at 2-5.

The police reports do not specify where in the basement these receptacles were located, where they were found in relation to other items, and what other items were present in the basement aside from a washer and dryer.

Detective Barbosa's report states that at approximately 9 PM, Lucy Pinto, Holleran's landlord and the tenant of the first floor apartment, contacted the police about damage to the exterior door of the apartment building. *See* Exhibit C at 2. He and another detective went to the residence to speak with Pinto. She stated that Holleran "is like a son to [her]" and has been living in the second floor apartment "for several years." In response to questions about the basement, Pinto reportedly stated, "[Holleran] does his laundry in the basement," and "pointed to the north east corner where the totes were located next to the washer and dryer, stating, "Ryan keeps his

things over there, none of these items are mine." She also stated, "Those aren't the[ir] stuff there are kids toys in there, the tenants on the third floor don't have any kids." Regarding her own use of the basement, the police report states that she said, "I have not been down to the basement since approximately March." *Id.*

Pinto also supplies the attached affidavit, which more fully describes Holleran's access to, and use of, the basement. *See* Pinto Aff., attached as Exhibit E. She explains that only she and Holleran had keys to unlock the basement door; the third floor tenants were not permitted to enter and did not have a key to unlock the padlock. *Id.* ¶¶6-7. The basement was always locked. *Id.* ¶5. In contrast to what was reported in Detective Barbosa's report, Ms. Pinto recalls unlocking the padlock not long before the police arrived and mistakenly leaving it unlocked. *Id.* ¶13. Pinto also notes that the washer and dryer belong to Holleran, and that he was the only one who used them because she had her own machines in her apartment. *Id.* ¶10. The basement was primarily used for Pinto's own storage purposes, but she allowed Holleran to use the area close to the washer and dryer to store some of his belongings. *Id.* ¶9.

Defense counsel also attaches photographs of the entrance and interior of the basement. *See* Exhibit F.

**B.    Search of Smart Phone**

On November 13, 2017, Detective Barbosa sought a warrant to search Holleran's iPhone, seized during his arrest, for "[a]ny data, files, documents referencing the selling, buying or use of illegal drugs." Application for Search Warrant, Det. Kevin Barbosa, Nov. 13, 2017, attached as Exhibit G. The affidavit in support of this application is the same affidavit submitted with three additional applications for warrants to search Holleran's other phones.[3] In the affidavit, the

---

[3]    The searches of the other phones did not yield substantial information and undersigned counsel has been advised that the government will not seek to introduce evidence from any phone other than Holleran's iPhone.

detective stated that Holleran had been arrested on drug and firearm charges, and during the arrest and execution of the search warrant, officers seized four cell phones. Detective Barbosa submitted the following to establish a nexus between all four phones and Holleran's alleged criminal activity:

> It is [a] commonly known practice for drug dealers to have a phone in their possession, for the use of arranging narcotics transactions. In addition to this implement of the drug trade, Ryan was also found in possession of money. With the collective knowledge, training, and experience of the detectives involved in this arrest, it is known that cell phones are used in nearly every street level drug transaction and is by far the most common means of communication for drug dealers to arrange drug sales.

*Id.* at 3.

An Assistant Clerk of the New Bedford District Court authorized the search warrant on November 13, 2017. Search Warrant, Nov. 13, 2017, attached as Exhibit H. Law enforcement agents conducted a forensic extraction of data from the iPhone, recovering a variety of data (including photographs and video recordings) that the government proposes to admit against Holleran at trial. *See* Search Warrant Return, Nov. 14, 2017, attached as Exhibit I.

## II.   ARGUMENT

By searching his basement without a warrant's authorization, and later searching his smart phone without validly issued warrant, the government violated Holleran's constitutional rights. The fruits of both searches must be suppressed.

### A.   **The police unlawfully seized the items from the basement because they had no authority to search Holleran's basement area.**

#### i.   **Legal standards**

The Fourth Amendment of the United States Constitution guarantees the right to be secure against "unreasonable searches and seizures" and requires that no warrants issue "but upon probable cause, supported by Oath or affirmation, and particularly describing the place to

be searched . . . ." U.S. Const. Am. IV.

As the Supreme Court has explained, "[a] warrant assures the citizen that the intrusion [into their privacy] is authorized by law, and that it is narrowly limited in its objectives and scope." *Skinner v. Railway Labor Executives Ass'n*, 489 U.S. 602, 622 (1989). Under the particularity requirement, "[a]s to what is to be taken, nothing is left to the discretion of the officer executing the warrant." *Marron v. United States*, 275 U.S. 192, 196 (1927). "The authority to search under a valid warrant 'is limited to the specific places described in it, and does not extend to additional or different places.'" *United States v. Vaughan*, 875 F. Supp. 36, 43 (D. Mass. 1995) (quoting *United States v. Heldt*, 668 F. 2d 1238, 1262 (D.C. Cir. 1981), *cert. denied*, 456 U.S. 926). The warrant's description of the area to be searched is "highly relevant in determining the permissible scope of the search." *Id.* (internal quotation marks and citation omitted). "As to multiunit buildings, a warrant to search one apartment therein . . . does not permit the search of another apartment therein." *Id.* (citing *United States v. Hinton*, 219 F.2d 324, 325-36 (7th Cir. 1955)).

When the area of a home falls outside the scope of a warrant, but police officers nonetheless proceed to search it, the defendant "has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." *United States v. Rheault*, 561 F.3d 55, 58-59 (1st Cir. 2009) (internal quotation marks and citations omitted). The defendant must prove that he had "a legitimate expectation of privacy" in the area that the police searched. *Id.* at 59. "The Supreme Court has set out a two-part test for analyzing the expectation question: first, whether the movant has exhibited an actual, subjective, expectation of privacy; and second, whether such subjective expectation is one that society is prepared to recognize as objectively reasonable." *Id.* (citing *Smith v. Maryland*, 442 U.S. 735, 740 (1979)).

**ii.      The warrant did not authorize a search of the basement.**

On its face, the warrant authorized the police to search for controlled substances (1) "at 116 North Street, Apartment 2 . . . which is occupied by and/or in the possession of Ryan Holleran" and (2) "on the person or in the possession of [Holleran]."[4] *See* Exhibit A. The warrant did not name the basement area, which was outside of its scope of authorization.

The first designation plainly authorized a search only of the second-floor apartment, and not the entirety of 116 North Street. The phrase "which is occupied by and/or in the possession of Ryan Holleran" modifies "Apartment 2," not "116 North Street" as a whole. In other words, the face of the warrant itself limited the search of 116 North Street solely to "Apartment 2" and did not purport to authorize the search of any location beyond "Apartment 2."

Significantly, there is no evidence that the basement was accessible "from the interior of the defendant's apartment," so the authority to search Holleran's apartment could not have encompassed the basement as well. *United States v. Albert*, 195 F. Supp. 2d 267, 280 (D. Mass. 2002); *see Vaughan*, 875 F. Supp. at 44 ("the basement was part of the first floor [target's] unit"). The only entrance to the basement of 116 North Street is through the rear stairwell. Exhibit E ¶4; Exhibit F at 1 (photograph of rear stairwell). The door to the basement is immediately behind Ms. Pinto's back door on the first floor. *Cf. Vaughan*, 875 F. Supp. at 44 (citing *Commonwealth v. Scala*, 380 Mass. 500 (1980) (designation of second-floor apartment included search of attic because the entrance to the attic was from the second-floor apartment and no other apartments shared the attic)).

The second designation gave police authority to search for drug paraphernalia "on the person or in the possession of [Holleran]." Because the word "possession" was stated after the

---

[4]      The warrant also authorized the search of others present who may be in possession of contraband.

phrase "on the person," the term referred to Holleran's immediate sphere of direct control. *See United States v. Andrews*, 847 F. Supp. 2d 236 (D. Mass 2012) (where warrant authorized search for firearms in defendant's apartment and "on the person or in the possession of" defendant, "officers were authorized by the warrant to search [defendant] only [at his apartment]"); *see also Vaughan*, 875 F. Supp. at 40 (where warrant allowed the search of "any person present who may be found to have such property in his or her possession or under his or her control," its scope included "any persons present . . . who might be found to have drug paraphernalia in their control."). The items in the basement were nowhere near Holleran when the police apprehended him, and were in fact two floors below him at the time of his arrest.

For those reasons, the warrant itself did not authorize police to enter the basement of the building.

### iii.     Holleran had a reasonable expectation of privacy in his area of the basement.

Because the warrant did not itself authorize police to search the basement, the remaining question is whether Holleran had a reasonable expectation of privacy in his area of the basement. He did, for the reasons that follow.

First, Holleran had a subjective expectation of privacy because his landlord was the only other person with access to the basement, and they shared the space with the understanding that the area near Holleran's washer and dryer belonged to him only. *See* Exhibit E ¶12. Moreover, none of the items seized in the basement were found in plain view or in such a manner that it would be possible to conclude that Holleran had forfeited his expectation of privacy in them. Detective Vicente's report states that each of the items seized from the basement was stored in a closed container. *See* Exhibit D at 3-5 (grey cylinder, two large dark gray tote bags). These actions exhibit that Holleran was "seek[ing] to preserve as private" the items at issue. *See Katz v.*

*United States*, 389 U.S. 347, 351 (1967).

Second, Holleran's subjective expectation of privacy was objectively reasonable because the basement was not a common area of the building, nor was it accessible to the public. The First Circuit has stated that "[i]t is now beyond cavil in this circuit that a tenant lacks a reasonable expectation of privacy in the common areas of an apartment building," but in this case, the basement was not a common area. *United States v. Hawkins*, 139 F.3d 29, 32 (1st Cir. 1998) (citation omitted). Whether an area of a multiunit dwelling is "common" is "necessarily a fact-specific inquiry, taking into consideration the nature of the searched location, and using [the First Circuit's] prior decisions as guidance." *Rheault*, 561 F.3d at 59.

With respect to the nature of the basement, as Pinto states in her affidavit, it was a largely private space. Pinto used the basement solely for her own purposes until Holleran's ex-girlfriend asked to install their washer and dryer in there. Exhibit E ¶8. She agreed to allow Holleran some storage space near his washer and dryer, and did not enter that area. *Id.* ¶12. At the time of the search, only she and Holleran possessed keys to the basement; she did not allow the third floor tenants to access it. *Id.* ¶¶6-7. She also required the basement to be locked at all times. *Id.* ¶5. That the padlock was unlocked when the police arrived was mere coincidence; Pinto mistakenly left it unlocked shortly beforehand. *Id.* ¶13.

The First Circuit's precedents are instructive by comparison. Where the same guarantees of privacy were not present, the court found the expectation of privacy unreasonable. *See, e.g.*, *Hawkins*, 139 F.3d at 32-33 (resident of apartment building told officer that there were storage compartments assigned to each apartment in the common basement; unenclosed areas were common and thus expectation of privacy was not reasonable); *United States v. Thornley*, 707 F.2d 622, 624-25 (1st Cir. 1983) (storage area was not kept locked; other person who used the

space was not told to limit her use; basement access was not restricted to any of the tenants; defendant was not a tenant).

The Sixth Circuit's decision in *United States v. King*, 227 F.3d 732 (2000) is also instructive. In that case, the court determined that the "Defendant enjoyed a reasonable expectation of privacy in the basement area of the two-family dwelling, where he shared the downstairs unit with his brother while his mother and siblings resided in the upstairs unit." *Id.* at 750. Holleran and Pinto have an unusually close relationship. Pinto told the officers that Holleran "is like a son to [her]." Exhibit C at 2. The basement was in many ways Pinto's own private space, but she allowed Holleran – and only Holleran – to share it with her. Where an area of a multiunit dwelling is shared by a small group of people with a relatively close relationship, courts have recognized that the area is not "common" for the purposes of the Fourth Amendment. *See Fixel v. Wainwright*, 492 F.2d 480, 484 (5th Cir. 1974) ("Contemporary concepts of living such as multi-unit dwellings must not dilute [the defendant's] right to privacy any more than is absolutely required. We believe that the [shared] backyard area of [the defendant's] home [a four-unit apartment building] is sufficiently removed and private in character that he could reasonably expect privacy.").

Because Holleran expected his property to remain private in an area of the basement his landlord agreed not to access, the government's warrantless search of this area was in violation of the Fourth Amendment.

### iv.      No warrant exception applies.

Once the officers found a key they suspected fit into the padlock on the basement door, the proper protocol would have been for them to seal the premises and apply for a warrant to the basement. *See Hawkins*, 139 F.3d at 33 ("Proceeding with [the] information [that a key found in

the defendant's apartment fit into the lock on a basement compartment] to seek a search warrant to inquire into the contents of the boxes was exactly what was appropriate under the circumstances of this case."). Since they had already succeeded in obtaining a warrant for the apartment, an additional warrant application would not have taken long to procure. No exception applies to absolve them of this constitutional duty.

There is no dispute that Holleran did not consent to a search of the basement. In addition, the police reports mention no exigent circumstances that would have affected the officers' ability to obtain a warrant.

The good faith exception also does not apply. In *King*, the Sixth Circuit determined that "the nature of the location of the basement in this two-unit dwelling should have put the agents on notice that the search warrant did not include this area." 227 F.3d at 751. It rejected the government's argument that "the officer lawfully searched the basement inasmuch as the warrant executed for a residence would have included the basement," stating, "the officer was not aware that the dwelling was being used in common by all of the tenants at the time of the search." *Id.* at 752. The court stated that the good faith exception did not apply:

> [T]he warrant did not reference the basement area, and the agent was aware of the warrant's limitations. The agents' assertions that the basement was included in the common area of Defendant's downstairs unit of this two-family dwelling is not reasonable under these circumstances. Specifically, the basement of the duplex was not accessible to the general public – i.e., the basement could not be reached from the outside because the door was locked and could only be entered if one of the tenants had admitted the guest into the duplex, and it was established law in this circuit at the time of the search that a tenant in an apartment building has a reasonable expectation of privacy in the common area of a building not open to the general public.

*Id.* at 754 (citations omitted).

The exception does not apply here for the same reasons. The search warrant explicitly

authorized a search only of Holleran's apartment. The basement was not mentioned in the warrant or in the warrant application. Where officers observed that the basement was two floors below Holleran's apartment, not accessible to the general public, and protected with a padlock, they should have paused to first obtain a warrant. Because they did not, the fruits of their search should be suppressed.

**B.      Even if police searched the basement within the scope of the warrant, the seizure of evidence was unlawful because the warrant was invalid.**

**i.      Legal standards**

Even where a warrant authorizes the search conducted, courts have suppressed evidence where the search warrant affidavit did not properly establish probable cause. *See, e.g.*, *United States v. Gifford*, 727 F.3d 92 (1st Cir. 2013). The First Circuit applies a "nonexhaustive list of factors" to examine a warrant affidavit's probable cause showing, including:

> (1) whether the affidavit establishes the probable veracity and basis of knowledge of persons supplying hearsay information; (2) whether an informant's statements reflect first-hand knowledge; (3) whether some or all of the informant's factual statements were corroborated wherever reasonable or practicable (e.g., through police surveillance); and (4) whether a law enforcement affiant assessed, from his professional standpoint, experience, and expertise, the probable significance of the informant's provided information.

*Id.* at 99 (citing *United States v. Tiem Trinh*, 665 F.3d 1, 10 (1st Cir. 2011)). "Where the primary basis for a probable cause determination is information provided by a confidential informant, the affidavit must provide some information from which a magistrate can credit the informant's credibility." *Id.*

**ii.      The affidavit in support of the application for the warrant to search Holleran's home did not sufficiently establish probable cause.**

Should the Court conclude that the warrant authorized police to search Holleran's

basement, it should still suppress the physical evidence because the warrant did not validly issue. Detective Barbosa failed to sufficiently establish probable cause according to the *Tiem Trinh* factors.

First, the affidavit did not establish the veracity of the persons supplying the hearsay information, which included CI-1 and the "unwitting party." Detective Barbosa provides no background information on either individual, stating only that CI-1 wished to remain anonymous for his safety. While the detective appeared to have spoken directly with CI-1, nothing in the affidavit suggests that CI-1 had personal interactions with Holleran. The affidavit does not mention any instance when the detective personally interacted with the unwitting party, who was the person who allegedly purchased controlled substances from Holleran. This degree of separation between CI-1 and Holleran is important, as it renders the precautions taken with CI-1 during the controlled buys meaningless.[5] In sum, the information Detective Barbosa relied on to establish probable cause was largely double-hearsay. With no information as to why CI-1 or the unwitting party should be deemed credible, the assistant clerk should not have issued the warrant.

Second, Detective Barbosa's investigation of Holleran resulted in the observation of ambiguous events that could not have corroborated CI-1's contention that Holleran was selling drugs from his apartment. The three events took place at unspecified times and could have occurred on the same day or weeks apart. *See* Exhibit A at 5-6. The first event involved Holleran pulling up behind another vehicle whose driver approached Holleran and then departed. The detective did not observe any unlawful activity. The second event involved a person entering

---

[5]     Prior to each of the controlled buys, Detective Barbosa states that CI-1 was searched "to ensure that he was not in possession of illegal monies or contraband" and carefully monitored during the course of the controlled buy. These precautions mean little when the operative acts (Holleran's alleged distribution of cocaine) were undertaken not by CI-1 but by the unwitting party, outside the view of the affiant and CI-1 alike.

Holleran's apartment building – not necessarily his apartment – and leaving within three minutes. The detective did not observe any unlawful activity. The third event involved a person pull up in front of the apartment building, "exit[] from the driveway," and reenter his vehicle after an unspecified amount of time. Again, the detective did not observe any unlawful activity. These three instances combined did not – and could not – establish probable cause that Holleran was committing any crime. None of the parties involved in these incidents are identified as drug users or dealers, and no cash exchange is observed.

Because the affidavit did not establish the reliability of the confidential informants, and the remaining information did not establish probable cause, the warrant should not have issued.

### iii.      No exception applies.

The government cannot argue that the police relied on the warrant in good faith where they "were reckless in not including in the affidavit information which was known or easily accessible to them," or "simply did not take every step that could reasonably be expected of them." *United States v. Fucillo*, 808 F.2d 173 (1st Cir. 1987) (internal quotation marks and citation omitted). Detective Barbosa "should have realized that [he] needed to do more independent investigative work" to establish probable cause. *See United States v. Weaver*, 99 F.3d 1372, 1380 (6th Cir. 1996). The Court should suppress the evidence obtained from the basement.

### C.      <u>The seizure of evidence from the smart phone was unlawful because the warrant was invalid.</u>

### i.      Legal standards

The Fourth Amendment requires "[a] warrant application [to] demonstrate probable cause to believe that . . . enumerated evidence of the offense will be found at the place to be searched – the so-called 'nexus' element." *United States v. Woodbury*, 511 F.3d 93, 97 (1st Cir. 2007)

(internal quotation marks and citation omitted). Courts have held that in the context of a warrant application to search a cell phone, "[p]ossessing a cell phone during one's arrest for drug-related conspiracy is insufficient by itself to establish a nexus between the cell phone and any alleged drug activity." *United States v. Ramirez*, 180 F. Supp. 3d 491, 495 (W.D. Ky. 2016). In addition, while "a magistrate judge may infer a nexus based on the type of crime being investigated, the nature of things to be seized, the extent of an opportunity to conceal the evidence elsewhere and the normal inferences that may be drawn as to likely hiding places, the inferential chain cannot be too long or too weak." *United States v. Olaya*, No. 15-CR-20200, 2017 WL 1967500, at *6 (E.D. Mich. Apr. 19, 2017) (internal quotation marks and citations omitted); *but see United States v. Gholston*, 993 F. Supp. 2d 704, 720 (E.D. Mich. 2014) ("a number of courts have found that an affidavit establishes probable cause to search a cell phone when it describes evidence of criminal activity involving multiple participants and includes the statement of a law enforcement officer, based on his training and experience, that cell phones are likely to contain evidence of communications and coordination among these multiple participants.").

> **ii.     The application for the warrant to did not demonstrate probable cause that the smart phone contained evidence of a crime.**

To establish that Holleran's smart phone was connected to criminal activity, Detective Barbosa stated in his search warrant affidavit only that "[i]t is a commonly known practice for drug dealers to have a phone in their possession," and that "it is known that cell phones are used in nearly every street level drug transaction and is by far the most common means of communication for drug dealers to arrange sales." Exhibit G at 3. These statements did not establish probable cause that Holleran's iPhone contained evidence of criminal activity.

The detective made no assertion that CI-1 or the unwitting party contacted Holleran on his iPhone to arrange any sort of drug transaction. He did not state that the police had intercepted

any such communications. That Holleran was arrested with the iPhone on his person could not itself have established probable cause that he was using the phone for drug sales. *See Ramirez*, 180 F. Supp. 3d 491.

The detective's statements attributing cell phones to drug dealers could apply to virtually any person in the United States. Cell phones are "by far the most common means of communication" for the vast majority of individuals in our society, and most people "have a phone in their possession." *See Carpenter v. United States*, -- S.Ct. --, 2018 WL 3073916 at *2 (June 22, 2018) ("cell phones and the services they provide are 'such a pervasive and insistent part of daily life' that carrying one is indispensable to participation in modern society." (citation omitted)); *Riley v. California*, 134 S. Ct. 2473, 2490 (2014) ("According to one poll, nearly three-quarters of smart phone users report being within five feet of their phones most of the time, with 12% admitting that they even use their phones in the shower." (citation omitted)). With no information specific to Holleran's phone and its alleged use for unlawful purposes, the search warrant affidavit failed to establish probable cause. A contrary finding would in effect permit a search warrant to issue as to any smart phone seized from any defendant charged with a drug offense, without any showing of individualized probable cause. This cannot be the case.

Again, where a law enforcement officer "should have realized that [he] needed to do more independent investigative work" to establish probable cause, the good faith exception does not apply. *Weaver*, 99 F.3d at 1380.

The evidence obtained from Holleran's iPhone was not pursuant to a valid warrant and therefore should be suppressed.

## III.   CONCLUSION

For the foregoing reasons, the police violated Holleran's rights under the Fourth

18

Amendment when officers searched his basement and smart phone without a valid warrant. The

Court should suppress the evidence obtained from those searches.

<div style="margin-left: 40%;">

RYAN HOLLERAN,
By His Attorneys,

/s/ *Scott Lauer*_____
Scott Lauer
B.B.O. # 667807
Samia Hossain
B.B.O. # 696329

Federal Public Defender Office
51 Sleeper Street, 5th Floor
Boston, MA 02210
(617) 223-8061
scott_lauer@fd.org
samia_hossain@fd.org

</div>

Date: July 10, 2018

## CERTIFICATE OF SERVICE

I, Scott Lauer, Esquire, hereby certify that this document filed through the ECF system will be sent electronically to the registered participant(s) as identified on the Notice of Electronic Filing (NEF) on July 10, 2018.

<div style="margin-left: 40%;">

/s/ *Scott Lauer*
Scott Lauer

</div>