UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

|                                  |   |                                  |
|----------------------------------|---|----------------------------------|
| UNITED STATES OF AMERICA         | ) |                                  |
|                                  | ) |                                  |
| v.                               | ) | Criminal Action No. 18-10064-LTS |
|                                  | ) |                                  |
| RYAN HOLLERAN.                   | ) |                                  |

_____)

ORDER ON MOTION TO SUPPRESS (DOC. NO. 25)

November 28, 2018

SOROKIN, J.

Defendant Ryan Holleran is charged with: (1) possession with intent to distribute

cocaine, oxycodone, and cocaine base, (2) possession of an unregistered firearm, (3) possession

of a firearm with an obliterated serial number, and (4) possession of a firearm in furtherance of a

drug trafficking crime.  Mr. Holleran moved to suppress evidence obtained from searches of his

apartment, the basement in his building, and his iPhone.  The government opposed.  The Court

held an evidentiary hearing on October 15, 2018.  After requesting and receiving further briefing

from the parties, the Court heard arguments on the motion to suppress on October 26, 2018.  For

the reasons that follow, the motion to suppress is ALLOWED IN PART and DENIED IN PART.

I.    FACTS

The Court makes the following factual findings based on the materials submitted by the parties and the credible testimony offered during the evidentiary hearing held on October 15, 2018. [1]

A.  116 North Street

In 1970, Lucy and Carlos Pinto purchased a three-family home at 116 North Street in New Bedford, Massachusetts.  Doc. No. 60 at 52.  The three-story home contains one apartment on each floor and an unfinished basement.  The exterior front door opens to a foyer and staircase which leads to the front door of each individual apartment.  Id. at 66-67.  The basement is not accessible from the front foyer.  The exterior rear door similarly opens to a foyer and staircase which leads to the back door of each individual apartment.  Id. at 65-66.  The rear foyer also has a door which opens to a staircase leading into the basement.  Id.  This door provides the only access to the basement.

The Pintos have always rented out two of the three apartments in their home.  In 1985, they moved to Dartmouth and, thereafter, rented all three apartments to tenants.  Id. at 61.  At that time, they also hired the third-floor tenant as a custodian to care for the house.  Id. at 69.  Approximately five years ago, Mr. Holleran began renting the second-floor apartment.  Id. at 73.  The Pintos did not know Mr. Holleran prior to that time.  Id. at 88.  Several years ago, the Pintos sold their home in Dartmouth and returned to live in the first-floor apartment at 116 North Street.  Id. at 61.  About three years ago, the Pintos' custodian moved out of the third-floor apartment.  Randy Schoerner and Richard Gonzalez then moved in as the new third-floor tenants.  Id. at 126.

---

[1] The following witnesses testified at the evidentiary hearing: Detective Kevin Barbosa, Detective Sergeant Tyson Barnes, Lucy Pinto, Carlos Pinto, Randy Schoerner, and Richard Gonzalez.  Doc. No. 60.

A few years after Mr. Holleran moved into the second-floor apartment, his then-girlfriend, Kelsey, and her two children (one of whom was also Mr. Holleran's child) moved in with him. Id. at 74, 79. Kelsey lived in the second-floor apartment with Mr. Holleran until the spring of 2017. Id. at 54. While living there, Kelsey asked Mrs. Pinto on a number of different occasions to store items in the basement. Id. at 55-57. Mrs. Pinto acquiesced to each of these requests, permitting Kelsey to store Christmas decorations, children's clothes, and various other personal items against one of the basement walls. Id. At Kelsey's request, Mrs. Pinto also allowed her and Mr. Holleran to install a washer and dryer in the basement so they could do their laundry without leaving the home. Id. at 57-58.

B.  The Basement

The Pintos keep the rear exterior door of their home locked. Id. at 68. The basement door has both a sliding bolt and a padlock to secure the door. Id. at 76. The Pintos have kept this door bolted and padlocked since moving into the home in 1970. Id. Tenants are not ordinarily provided a key to the padlock or access to the basement. When the Pintos arranged for the third-floor tenant to serve as a custodian, they gave him a key to the padlock. Id. at 69. When he moved out of the house two years ago, he returned the key. Id. at 72.

The basement consists of an unfinished open area available for storage, two separate storage rooms where the Pintos keep personal items, and the various utility systems for the home which are located in the open area. Id. at 63-64, 92. Each of the two storage rooms has a door separating it from the open area, which the Pintos keep locked at all times. Id. The Pintos also store some of their property in the open area. Id. at 65.

When Kelsey requested permission to store items in the basement, Mrs. Pinto provided her a key to the padlock. Id. at 71. When Kelsey moved out, she did not return the basement

key, and Mrs. Pinto never requested it from Mr. Holleran.  Id. at 83.  Mr. Holleran retained

permission to use part of the open area of the basement for storage and to access his washer and

dryer for laundry.  The Pintos never provided Randy Schoerner or Richard Gonzalez permission

to use the basement or a key to the basement padlock.  Id. at 72.  As a result, the third-floor

tenants did not use the basement.  At the time of the search, Mr. Holleran was the only tenant

with permission to use the basement.  Mrs. Pinto had designated a space within the open area for

him to use, and only his or Kelsey's property occupied that area.  Mrs. Pinto never opened or

otherwise handled the boxes, bags, or other containers in his area.  Id. at 95.  When Mrs. Pinto

allowed Kelsey and Mr. Holleran to access the open area of the basement, she did not remove

her property, but rather agreed to share this private space with them.  She also did not remove the

padlock from the door to the basement.

    C.  The Investigation of Mr. Holleran

In the affidavit submitted in support of the search warrant, Detective Kevin Barbosa of

the New Bedford Police Department described his investigation of Mr. Holleran.  Doc. No. 25-1.

On or after October 9, 2017, a confidential informant ("CI") known to Detective Barbosa

reported that a male known as Ryan Holleran sold cocaine from 116 North Street, Apartment 2,

New Bedford, Massachusetts.  Id. at 3.  The CI told Detective Barbosa that he or she purchased

cocaine from Mr. Holleran through an "unwitting party,"[2] that the CI had observed this other

person make phone contact with Mr. Holleran, and that the CI had observed Mr. Holleran sell

_____

[2] The affidavit attached to the search warrant used this term.  Doc. No. 25-1.  Ordinarily, the
Court understands this term as referring to a person who aids a criminal act but who is unaware
that his or her actions are in fact furthering a crime.  Here, the Court understands the term to
refer to a person unaware that he or she is assisting an undercover investigation, as the
"unwitting party" in the affidavit plainly understood that he or she was purchasing cocaine.

cocaine.  Id.  The CI also provided Detective Barbosa with a description of Mr. Holleran, as well as the make, model, and license plate number of his car.  Id.

While the affidavit contains no information from other investigations in which Detective Barbosa (or any other officer) found the CI reliable, it describes in detail the investigation Detective Barbosa undertook in response to the information provided by the CI.  Detective Barbosa confirmed that Ryan Holleran lived at the apartment based on Eversource utility records, Registry of Motor Vehicle ("RMV") records, and a police report regarding a domestic disturbance from May 12, 2017.[3]  Id. at 4-5.  The RMV records also confirmed that Mr. Holleran operated the type of vehicle described by the CI with the license plate number provided by the CI.  Id. at 4.  Board of Probation records revealed that Mr. Holleran had ten adult arraignments for possession or distribution of controlled substances.  Id. at 5.  While conducting surveillance, Detective Barbosa observed Mr. Holleran coming and going from the home in the identified car.  Id. at 5.  Detective Barbosa also observed three separate events "consistent" with drug distribution, which he described in detail in his affidavit.  Id. at 5-6.

Finally, Detective Barbosa arranged two "controlled" purchases of cocaine from Mr. Holleran.  These followed typical practice except in one material way.  Instead of the CI making the transaction him or herself, the CI gave the buy money to the "unwitting party," who in turn went to 116 North Street, entered the home, and then returned with cocaine for the CI.  Id. at 6-7.  Officers followed both the CI and the unwitting party at all relevant times but did not observe where within the home the unwitting party went or with whom he or she met.  Id.

---

[3] This is a separate incident from an incident on May 30, 2017, when Mrs. Pinto reported to police that Kelsey broke into the home through the front exterior door by smashing the window in that door and then entering the second-floor apartment.  Doc. No. 63-1.

Based upon the foregoing information, on November 9, 2017, Detective Barbosa applied for a warrant to search Apartment 2 at 116 North Street for evidence of drug distribution. A New Bedford District Court Clerk-Magistrate, Patrick Walsh, issued a no-knock warrant on the same day. Doc. No. 25-2. The warrant authorized a search of the following areas:

1. "116 North Street Apartment 2 in New Bedford, Massachusetts. 116 North Street Apartment 2 is a multi family dwelling with green wood shingles with a white trim around the windows. The numbers 116 are affixed to the left of the front door. The front door faces north. which [sic] is occupied by and/or in the possession of: Ryan Holleran";
2. "on the person or in the possession of: [Ryan Holleran]";
3. "any person present who may be found to have such property in his or her possession or under his or her control or to whom such property may have been delivered."

Id. New Bedford police officers executed the warrant the next day. Doc. No. 25-3 at 1.

D. Execution of the Search Warrant

Officers arrived at 116 North Street at approximately 6:00 p.m. on November 10, 2017. Doc. No. 60 at 12-13. They forcibly entered the rear exterior door of the building, entered the home, ascended the rear stairs, and then forcibly entered the second-floor apartment rear door. Doc. No. 25-4 at 1. Inside the apartment, they found only Mr. Holleran, who was detained without incident. Id. In the search of the apartment, the officers seized two plastic bags which each contained 100 tabs of Oxycodone, materials used for cutting and bagging controlled substances, four cellphones, and various other items not relevant to the issues raised by the pending motion. Id. at 1-2. The officers found no cocaine in the apartment. Doc. No. 60 at 18. They did find a set of three keys behind the frame of a built-in bookshelf. Id. at 48. Detective Barbosa and Sergeant Tyson Barnes took these keys and went down the rear staircase to the basement door. Both officers observed the padlock in the unlocked position. Id. at 20, 42. One observed the sliding bolt in the unlocked position. Id. at 42. They tried one of the keys in the basement padlock, confirmed it fit, and then proceeded down the stairs to the basement. Id. at

49. The Court finds that the padlock was in the unlocked position when the officers inserted the key.[4]

The officers then searched the basement without hesitation, as they do whenever they search a multi-family home.  Id. at 22.  They searched the entire open area of the basement, including both Mr. Holleran's property and the Pintos' property, and found bags containing cocaine and four firearms.  Doc. No. 25-4 at 3-5.  The officers did not search or attempt to search the two locked storage rooms accessible from the open area of the basement.  Doc. No. 60 at 50.  At the conclusion of the search, the officers arrested Mr. Holleran.

E.  The Post-Search Events

Mrs. Pinto maintains a video surveillance system on her front door.  Id. at 85.  It alerted her to the officers departing her home with Mr. Holleran in handcuffs.  Id. at 85-86.  She returned home, discovered the damaged doors, and telephoned the police department to complain.  Detectives Barbosa and Gracia returned later that evening to speak with Mrs. Pinto.  Doc. No. 25-3 at 2.  She told them that she had "not been down to the basement since approximately March."  Id.  The officers reported this conversation in the police report prepared about the search.  Id.

---

[4] The Court pauses to comment in detail regarding this issue given the time and attention devoted to it by the parties. Both officers testified credibly that the padlock was unlocked.  The police report describes the padlock as unlocked.  While the Court credits Mrs. Pinto's testimony that she generally kept the padlock locked, she did not know its status at the time of the search.  Mrs. Pinto fell quite ill in the spring of 2017.  Though she could, and did, go upstairs to Mr. Holleran's apartment when necessary and go down to the basement to retrieve important items, these were not regular activities for her between the spring of 2017 and the date of the search.  In addition, Mrs. Pinto signed an affidavit typed by the Mr. Holleran's attorney in which she stated under oath that she had mistakenly left the padlock unlocked shortly before the search.  Doc. No. 25-5 ¶ 13.

F.   The Search of the iPhone

Four days later, Detective Barbosa applied for and received a warrant authorizing him to

search four cell phones seized from Mr. Holleran's apartment.  Docs. No. 25-7, 25-8.  In his

supporting affidavit, Detective Barbosa did not specifically allege that Mr. Holleran used the

phones in connection with the crimes for which he had been arrested.  Doc. No. 25-7.  In relevant

part, the affidavit states that "[i]t is a commonly known practice for drug dealers to have a phone

in their possession, for the use of arranging narcotics transactions," and that "it is known that cell

phones are used in nearly every street level drug transaction and [are] by far the most common

means of communication for drug dealers to arrange drug sales."  Id. at 3.  The affidavit said

almost nothing about Mr. Holleran's activities or the nexus between the phones and Mr.

Holleran's alleged drug distribution.

However, the affidavit did inform the Clerk-Magistrate that the officers found the four

phones "[d]uring the execution of the search warrant arrest."  Id.  In the affidavit that

accompanied the application for the first search warrant, Detective Barbosa stated that the CI

"has been present when phone contact is made between the unwitting party and 'Ryan

Holleran.'"  Doc. No. 25-1 at 3.  Both warrants were issued by the same Clerk-Magistrate within

four days of one another.  Docs. No. 25-2, 25-8. Officers searched the phones and found, at least

on one, information the government intends to use at trial. [5]

II.    LEGAL STANDARD

"A search within the meaning of the Fourth Amendment 'occurs when the government

violates a subjective expectation of privacy that society recognizes as reasonable.'"  United

---

[5] Mr. Holleran "has been advised that the government will not seek to introduce evidence from
any phone other than [his] iPhone."  Doc. No. 25 at 6.

States v. D'Andrea, 648 F.3d 1, 5-6 (1st Cir. 2011) (quoting Kyllo v. United States, 533 U.S. 27, 33 (2001)). The defendant "has the burden of establishing that 'his own Fourth Amendment rights were violated by the challenged search or seizure.'" United States v. Rheault, 561 F.3d 55, 58-59 (1st Cir. 2009) (quoting Rakas v. Illinois, 439 U.S. 128, 131 n.1 (1978)). If the defendant establishes that the search violated his constitutional rights, then the "exclusionary rule, where applicable, requires suppression of evidence obtained in violation of the Fourth Amendment." D'Andrea, 648 F.3d at 6.

III. DISCUSSION

A. Validity of the Apartment Search Warrant

Mr. Holleran argues that the November 9, 2017 search warrant was invalid because Detective Barbosa's affidavit did not contain sufficient information to establish probable cause. Doc. No. 25 at 14. Mr. Holleran contends that "the affidavit did not establish the veracity of the persons supplying the hearsay information, which included CI-1 and the 'unwitting party,'" and that "Detective Barbosa's investigation of Holleran resulted in the observation of ambiguous events that could not have corroborated CI-1's contention that Holleran was selling drugs from his apartment." Id. at 15. "As the challenged search was conducted pursuant to a warrant, the burden falls to the defendant[] to show by a preponderance of the evidence that the search was unlawful." United States v. Legault, 323 F. Supp. 2d 217, 220 (D. Mass. 2004). The Court must "review the affidavit to make 'a practical, common-sense' determination as to whether, 'given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" Id. (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)); see also United States v. Tiem Trinh, 665 F.3d 1, 10 (1st Cir. 2011) (identifying a non-exhaustive list of relevant factors to consider in evaluating probable cause

including "whether the affidavit establishes the probable veracity and basis of knowledge of persons supplying hearsay information, . . . whether an informant's statements reflect firsthand knowledge, . . . whether some or all [of] the informant's factual statements were corroborated wherever reasonable and practicable (*e.g.,* through police surveillance), . . . and . . . whether a law enforcement affiant assessed, from his professional standpoint, experience, and expertise, the probable significance of the informant's provided information.") (quotation marks and citations omitted).

The affidavit establishes probable cause. The CI identified Mr. Holleran as distributing controlled substances, which suggested that the CI had personally observed Mr. Holleran doing so. The officers corroborated this information. They verified from multiple reliable sources that Mr. Holleran lived at 116 North Street, Apartment 2 as stated by the CI, that he drove the car described by the CI, and that he fit the description provided by the CI. They also had the CI identify Mr. Holleran by his photograph.

The officers did more than verify the CI's assertion that Mr. Holleran sold cocaine from his home; they gathered independent evidence. Detective Barbosa conducted surveillance of 116 North Street. He observed three separate events, described in detail, which, based on his experience, were consistent with drug distribution activity. In addition, he arranged for the CI to make two controlled purchases of cocaine from Mr. Holleran. The CI made these purchases via the unwitting third party. Nothing suggests any officers searched the unwitting party nor that they observed this person conducting a drug transaction with Mr. Holleran. However, the unwitting party on each occasion went to 116 North Street with the buy money and returned with cocaine. Officers maintained constant surveillance of the unwitting party except when he or she went inside 116 North Street.

Under the totality of these circumstances, the affidavit establishes probable cause to search 116 North Street, Apartment 2 for the evidence specified in the warrant, and Mr. Holleran has failed to carry his burden to prove that the warrant was unlawful. Accordingly, the Court DENIES the motion to suppress insofar as it seeks to suppress the evidence seized from within Apartment 2.

B. Reasonable Expectation of Privacy

Mr. Holleran next seeks to suppress the evidence seized from the basement of 116 North Street. He bears the burden to establish that the search of the basement violated his Fourth Amendment rights.[6] Rheault, 561 F.3d at 58-59. To do so, he must show that he "had a reasonable expectation of privacy in the place searched or the thing seized." United States v. Thornley, 707 F.2d 622, 624 (1st Cir. 1983); accord United States v. Hershenow, 680 F.2d 847, 855 (1st Cir. 1982). "The Supreme Court has set out a two-part test for analyzing the expectation question: first, whether the movant has exhibited an actual, subjective, expectation of privacy; and second, whether such subjective expectation is one that society is prepared to recognize as objectively reasonable." Rheault, 561 F.3d at 59.

In determining whether a person had a subjective expectation of privacy, "[t]he relevant question is whether [he] was 'seeking to preserve as private' the evidence at issue." Id. (quoting Katz v. United States, 389 U.S. 347, 351 (1967)). The First Circuit has found a subjective expectation of privacy where the defendant's purpose in placing incriminating items in a shared basement "was to hide them and their incriminating contents." Thornley, 707 F.2d at 624; see also Rheault, 561 F.3d at 59 (finding that the defendant's "decision to place the gun and drugs

---

[6] The parties agree that the warrant did not authorize the search of the basement. Doc. No. 25 at 9; Doc. No. 41 at 17; Doc. No. 56; Doc. No. 57.

inside the washing machine on the third-floor landing sufficiently evidences an intent to hide them, and thus demonstrates a subjective expectation of privacy").

Plainly, Mr. Holleran had a subjective expectation of privacy in the containers in the basement of 116 North Street from which the officers seized the challenged evidence. Each of the containers or bags was closed, and their contents were not visible or in plain view. The officers found the containers in the portion of the open area of the basement designated by the landlord for Mr. Holleran, who possessed a key to the padlock on the basement door.

"However, a legitimate expectation of privacy means more than a subjective expectation of keeping incriminating evidence hidden," and Mr. Holleran must also establish that his "subjective expectation, viewed objectively, is justifiable under the circumstances." Thornley, 707 F.2d at 624. In the First Circuit common areas within the locked envelope of a multi-unit residential building (such as basements or hallways) are not necessarily protected by the Fourth Amendment. See United States v. Hawkins, 139 F.3d 29, 32 (1st Cir. 1998) ("It is now beyond cavil in this circuit that a tenant lacks a reasonable expectation of privacy in the common areas of an apartment building.").[7]

In this Circuit, determining what constitutes a "common area . . . is necessarily a fact-specific inquiry, taking into consideration the nature of the searched location, and using [the First Circuit's] prior decisions for guidance." Rheault, 561 F.3d at 59. The First Circuit has considered numerous factors in evaluating common areas, including whether the area is "well-traveled," United States v. Cruz-Pagan, 537 F.2d 554, 557-58 (1st Cir. 1976), whether a locked door controlled access to the area, Thornley, 707 F.2d at 624, the number of tenants authorized to

---

[7] This is in contrast to some other circuits. See United States v. King, 227 F.3d 732, 744 (6th Cir. 2000) ("[T]his Court has recognized that a tenant in an apartment building has a reasonable expectation of privacy in the common area of the building not open to the general public.").

use or prohibited from using the area, id., the physical relationship between the area searched and the defendant's apartment, Rheault, 561 F.3d at 61, the defendant's right to control the area, Hershenow, 680 F.2d at 854, and whether the area was open or enclosed, Hawkins, 139 F.3d at 32. Two cases merit particular consideration.

In Hawkins, officers received a warrant to search the defendant's apartment, one of twelve in the building. 139 F.3d at 31. In the apartment building, "there were storage compartments assigned to each apartment in the common basement of the building." Id. Each storage area was enclosed by chicken wire, and all but two were marked with numbers corresponding to the apartment numbers within the building. Id. None of the marked areas corresponded with the number of the defendant's apartment. Id. When police tested several keys found in the defendant's apartment on the two unmarked units, they discovered that one of the keys fit the lock on one of the storage spaces. Id. Upon discovering this, the officers sought a warrant to search the contents of that storage space, which included a number of closed boxes. Id. at 32. On appeal, the First Circuit held, over defendant's objection, that the unenclosed areas of the basement in the apartment building qualified as a "common area" in which the defendant did not have a reasonable expectation of privacy. Id. at 32-33. It also rejected the defendant's challenge to the insertion of the key in the lock of the storage unit and concluded that "proceeding with this information to seek a search warrant to inquire into the contents of the boxes was exactly what was appropriate under the circumstances of this case." Id. at 33.

In Thornley, the First Circuit found that "there was no objective, justifiable expectation of privacy in the storage area" of a basement of a three-story home. 707 F.3d at 625. While superficially similar, that case presented materially different facts than the pending case. In Thornley, the defendant was not a tenant of the building. Id. at 624. All of the tenants used the

13

basement "in common" to store their belongings.  Id.  The defendant left his items in a storage

area within the basement which was itself "never locked."  Id.  Children also "regularly" used

that area of the basement as a "play area."  Id. at 625.

A number of factors persuade the Court that Mr. Holleran has met his burden to establish

that he had a reasonable expectation of privacy in the containers stored within the open area of

the basement.  The case before the Court is "a close case, the resolution of which is heavily

dependent on particular facts."  Rheault, 561 F.3d at 61.  As a general matter, the basement was a

private area inaccessible to tenants and visitors.  The landlord provided express permission to

Mr. Holleran to use a portion of the open area of the basement while she continued to prohibit all

other tenants from doing so.  Though unlocked on the day of the search, the landlord had

equipped the basement door with a padlock and she generally kept it locked.[8]  Mr. Holleran had

a key provided by the landlord.  The front and rear exterior doors of the home itself were always

locked.

In these circumstances, the basement of 116 North Street was neither "well-traveled" as

in Cruz-Pagan, nor open to all tenants as in Hawkins, nor easily accessible as in Thornley.

Rather, the space was private and divided among two separate households within a three-family,

owner-occupied home.  The two households enjoyed a close relationship; Mrs. Pinto even

---

[8] The Court rejects Mr. Holleran's argument that the First Circuit decision in United States v.
Bain rendered unconstitutional the officers' insertion of the key into the padlock.  Doc. No. 58 at
5-6.  Bain was limited to the insertion of a key into the lock of an apartment door.  874 F.3d 1,
14-16 (1st Cir. 2017).  Several important facts distinguish this case from Bain: the officers were
authorized to enter the home because they were executing a search warrant, the lock into which
they inserted the key was not on the apartment but rather was on the basement, a storage area.
Furthermore, the officers acted while in an unprotected common space in which they were
legally authorized to be.  In Hawkins, the First Circuit held that officers could insert a key into
the lock of an individual storage area in a common basement.  139 F.3d at 32-33.  The
circumstances of this case are far closer to Hawkins than Bain, and as such, the insertion of the
key into the basement padlock was not an unconstitutional search.

described Mr. Holleran as "like a son" to her. Doc. No. 60 at 88. That the Pintos retained use of other portions of the open area as well as general access to the entire open area does not defeat, in these circumstances, Mr. Holleran's reasonable expectation of privacy. Therefore, the officers were required to obtain a warrant to search the basement. Unless an exception to the warrant requirement applies, Mr. Holleran has met his burden to establish that the warrantless search of the basement violated his Fourth Amendment rights.

C. The Good Faith Exception

The government invokes the good faith exception to the warrant requirement to defeat suppression of the fruits of the warrantless search of the basement. Doc. No. 41 at 23. In Davis v. United States, the Supreme Court held that "searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule." 564 U.S. 229, 231-32 (2011). This "exception is available only where the police rely on precedent that is clear and well-settled." United States v. Sparks, 711 F.3d 58, 64 (1st Cir. 2013) (quotation marks omitted); see also Bain, 874 F.3d at 20 (holding that the Davis good faith exception did not apply to facts which differed from First Circuit precedent "in ways that a reasonable person would suspect might be legally significant").

The government argues that First Circuit precedent clearly excluded "common areas" of apartment buildings from areas in which an individual tenant has a reasonable expectation of privacy. Doc. No. 41 at 24. However, the essential question is whether the basement in this home was a "common area" under clearly binding precedent. It was not. The First Circuit's decisions establish certain binding principles: that well-traveled areas within multi-unit buildings are not protected by the Fourth Amendment, that whether an area is common depends upon the particular characteristics of the area, and that areas open to and accessible by all tenants, even

within three-family dwellings, are not protected by the Fourth Amendment. These principles did not render the search of the basement at 116 North Street objectively reasonable as required by the Davis exception.

Only one door in the back of the building provided entry to the basement. Therefore, visitors entering by way of the front door had no ready means of access to the basement. The basement door bore both a latch and padlock, which had been added to the door (meaning they were not part of the original door). While unlocked at the time of the search, the presence of these locks suggested a conscious decision to limit access to the basement. Prior to entry, the officers used a key hidden in Mr. Holleran's apartment, rather than the key to his apartment door to unlock the padlock. These facts also suggested that the landlord had decided to limit access to the basement even among the small number of tenants within the home. In short, these facts indicated that access to the basement was controlled and that it was a private space which Mr. Holleran had permission to access.

These characteristics of the basement at 116 North Street differ from previously decided First Circuit cases "in ways that a reasonable person would suspect might be legally significant." Bain, 874 F.3d at 20. A reasonable officer would have thought these differences legally significant, which indeed they are. "[W]here judicial precedent does not clearly authorize a particular practice, suppression has deterrent value because it creates an 'incentive to err on the side of constitutional behavior,'" and the good faith exception is unavailable. Sparks, 711 F.3d at 64 (quoting United States v. Davis, 598 F.3d 1259, 1265–66 (11th Cir. 2010), aff'd, 564 U.S. 229 (2011)). Accordingly, the Davis good-faith exception does not apply.

D.  Inevitable Discovery

Finally, the government argues that the Court should decline to suppress the evidence under the inevitable discovery doctrine.  For the doctrine to apply, the government must prove by a preponderance of the evidence that the unlawfully discovered evidence inevitably would have been discovered by lawful means.  United States v. Infante-Ruiz, 13 F.3d 498, 503 (1st Cir. 1994).  Specifically, the government must prove: "(i) the lawful means of its discovery are independent and would necessarily have been employed, (ii) discovery by that means is in fact inevitable, and (iii) application of the doctrine in a particular case will not sully the prophylaxis of the Fourth Amendment."  United States v. Zapata, 18 F.3d 971, 978 (1st Cir. 1994).

The government has not met its burden on third prong of this test.  The Supreme Court has emphasized that the warrant requirement "greatly reduces the perception of unlawful or intrusive police conduct, by assuring 'the individual whose property is searched or seized of the lawful authority of the executing officer, his need to search, and the limits of his power to search.'"  Gates, 462 U.S. at 236 (quoting United States v. Chadwick, 433 U.S. 1, 9 (1977)). This is particularly so when the search at issue occurs within the walls of a small home where Fourth Amendment protections are stronger than in other settings.  See Payton v. New York, 445 U.S. 573, 589 (1980) ("The Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home—a zone that finds its roots in clear and specific constitutional terms: 'The right of the people to be secure in their . . . houses . . . shall not be violated.'").

In this case, the officers simply operated on the assumption that all basements are unprotected common spaces.  Doc. No. 60 at 22.  They did not seek a warrant, even after the

fact, but the government now invokes the inevitable discovery doctrine on the basis that the officers could have applied for a warrant and would have if they thought they needed to. Applying the inevitable discovery doctrine in this case "would substitute proof by a preponderance of the evidence that a warrant could and would have been obtained for the requirement of the [F]ourth [A]mendment that a warrant must in fact be obtained through a neutral and detached magistrate prior to a search." United States v. Silvestri, 787 F.2d 736, 745 (1st Cir. 1986); see also United States v. Matthews, No. 05-CR-10073-NG, 2006 WL 1581574, at *8 (D. Mass. Mar. 1, 2006) ("Police would not bother securing warrants if warrantless searches could be justified by probable cause and the claim that officers *could* have obtained a warrant had they wanted one.") (emphasis in original); United States v. Torres, 274 F. Supp. 2d 146, 162 (D.R.I. 2003) ("The Government would have this Court hold that so long as there was probable cause to obtain a warrant at the time of the illegal entry, the failure to secure one is excused. This substitutes the probable cause standard for the Fourth Amendment warrant requirement. The Silvestri court explicitly instructed against this. There can be no dispute but that to apply the inevitable discovery doctrine under the facts of this case would significantly weaken Fourth Amendment protections."); cf. United States v. Gardiner, No. 16-CR-00091-JAW, 2017 WL 1089328, at *10 (D. Me. Mar. 22, 2017) ("In the circumstances of this particular case, the Court concludes that there is not a danger that the doctrine's application will 'provide an incentive for police misconduct or significantly weaken [F]ourth [A]mendment protections.' . . . The situation would be starkly different if the officers illegally searched the home and sought to justify an otherwise illegal search by claiming that they could have and would have sought and obtained a search warrant all along.") (quoting Silvestri, 787 F.2d at 744).

The Court acknowledges and has considered the meaningful social cost of suppressing the firearms and drugs found in the basement.  Nonetheless, when presented with a novel factual scenario which does not fit within well-settled appellate precedent authorizing a warrantless search, police officers should "err on the side of constitutional behavior," Sparks, 711 F.3d at 64, and seek a warrant for the search they wish to conduct.  The officers had ample other lawful means to search the basement.  They could have requested authority to include the basement within the scope of the areas searched pursuant to the warrant.  See United States v. Ferreras, 192 F.3d 5, 8 (1st Cir. 1999) ("The search warrant stated: 'Place and person to be searched: 30 Pekin Street, 2nd floor apartment and basement . . . .'").  They could have sought consent from the landlord.  See United States v. Rodrigues, No. 03-CV-10329-PBS, 2005 WL 1106914, at *3 (D. Mass. May 5, 2005) ("Even if the defendant could assert a Fourth Amendment violation in this case, his challenge would not succeed because Mr. Walker, the property manager, gave valid consent for the search.").  They also could have obtained another warrant, including by phone, prior to searching the basement.  See Fed. R. Crim. P. 4.1, 41.  However, the officers never sought a warrant for the basement, even after the search.  Cf. United States v. Ford, 22 F.3d 374, 378 (1st Cir. 1994) ("It is inevitable that the existence of probable cause would find fruition in the issuance of a search warrant. This is bolstered by the fact that there is evidence in the record, relied upon by the district court, that a decision to seek a warrant had been made prior to the warrantless entry.").

Application of the inevitable discovery doctrine in this case would "substantially weaken[] the protection provided by the [F]ourth [A]mendment."  Silvestri, 787 F.2d at 745. Accordingly, the government has not met its burden of proof to establish that the inevitable

discovery doctrine applies.  The motion to suppress is ALLOWED as to the items seized in the basement.

      E.  <u>The Search of the iPhone</u>

Mr. Holleran also seeks to suppress the evidence obtained from the search of his cell phone.  Doc. No. 25-8.  He argues that the affidavit submitted by Detective Barbosa in support of the second search warrant, Doc. No. 25-7, is insufficient to establish probable cause because it does not include any facts or assertions that the phone was used by Mr. Holleran in the alleged criminal activity.  Doc. No. 25 at 17.

A finding of probable cause "demands proof sufficient to support a fair probability that a crime has been committed and that evidence of that crime is likely to be found within the objects to be searched."  <u>United States v. Coombs</u>, 857 F.3d 439, 446 (1st Cir. 2017).  In his affidavit supporting the warrant application, Detective Barbosa stated:

> During the execution of the search warrant arrest, detectives located four (4) cellular telephones the phones described as a white Apple Iphone cellular phone, a grey ZTE Verizon cellular phone, a black Samsung Verizon cellular phone, and a black Samsung Verizon cellular phone.  It is commonly known practice for drug dealers to have a phone in their possession, for the use of arranging narcotics transactions.  In addition to this implement of the drug trade, [Mr. Holleran] was also found in possession of money.  With the collective knowledge, training, and experience of the detectives involved in this arrest, it is known that cell phones are used in nearly every street level drug transaction and [are] by far the most common means of communication for drug dealers to arrange drug sales.

Doc. No. 25-7 at 3.  Three facts, taken together, establish probable cause to search the cell phones.

First, Detective Barbosa referenced the "execution of the search warrant arrest," thereby connecting this affidavit to the prior application to search Mr. Holleran's apartment submitted issued just four days earlier.  <u>Id.</u>  Second, in that earlier application, Detective Barbosa informed the Clerk-Magistrate that the "confidential informant stated it has been present when phone

contact is made between the unwitting party and 'Ryan Holleran.'" Doc. No. 25-1 at 3. Third, both warrants were issued by the same Clerk-Magistrate. In these circumstances, and in light of the affidavit as a whole, probable cause supported the warrant authorizing the search of the iPhone. Accordingly, Mr. Holleran's motion to suppress is DENIED insofar as it relates to evidence obtained from the search of the phone.

IV.    CONCLUSION

For the foregoing reasons, the Motion to Suppress (Doc. No. 25) is ALLOWED IN PART by suppressing the items seized in the basement, and OTHERWISE DENIED. The Court will hold an initial pretrial conference on December 3, 2018 at 11 a.m.[9] The government shall be prepared to address any period of unexcluded time that has elapsed since Mr. Holleran's initial appearance that it seeks to exclude.

SO ORDERED.

 /s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge

---

[9] The Court acknowledges the complicated nature of the issues raised by the motion and the helpful submissions from both counsel.